## Queen Insurance Company et al. v. John Spry Lumber Company.

### Gen. No. 13,615.

1. INSURANCE—*when reformation of contract of, will not be awarded.* Before a court will grant reformation of a fire insurance policy, narrowing its scope with respect to property covered, it will consider the question as to whether the company seeking reformation has acted with promptness and with due regard to equitable principles.

2. INSURANCE—*when reformation of contract of, will not be awarded.* Held, under the evidence in this case, that it was proper to deny reformation of a fire insurance policy narrowing the provisions thereof with respect to the property covered.

3. REFORMATION OF CONTRACT—*when cannot be had.* An attempt to supersede a written agreement with the parol negotiations which preceded and induced it cannot succeed under the form of a suit in equity to reform this contract.

4. REFORMATION OF CONTRACT—*degree of proof necessary.* The evidence to support a reformation of a written contract, where such reformation amounts to a rescission, should approach certainty.

Bill in chancery. Appeal from the Superior Court of Cook county; the Hon. WILLARD M. McEWEN, Judge, presiding. Heard in this court at the March term, 1907. Affirmed. Opinion filed February 13, 1908.

BEACH & BROWN, for appellants.

ADAMS & FROEHLICH, for appellee.

MR. JUSTICE BROWN delivered the opinion of the court.

This appeal is from a decree of the Superior Court dismissing for want of equity a bill in chancery brought by appellants against the appellee to reform four several policies of insurance issued to appellee by the appellants, and a fire loss having occurred of property which appellee claimed was covered by said policies, and suits at law having been brought by it on the same, to enjoin the bringing or further prosecution of actions at law against the appellants for such

loss or damage until the determination of the suit at bar.

The policies, the reform of which was sought by the bill, were as follows:

Policy 1773078 of the Queen Insurance Company of America for $750, dated March 15, 1905, and running for one year.

Policy 1758939 of the Queen Insurance Company of America, for $1,000, dated August 19, 1905, and running for one year.

Policy 16694 of the National Union Fire Insurance Company of Pittsburg, for $1,500, dated December 5, 1904, and running for one year.

Policy 320347 of the Virginia State Insurance Company, for $500, dated March 15, 1905, and running for one year.

Each was of the usual standard form, and insured the John Spry Lumber Company against all direct loss or damage by fire to the amount mentioned in the policy, "to the following described property while located and contained as described herein, and not elsewhere, to wit:

JOHN SPRY LUMBER COMPANY.

(*Amt. of Policy.*)   On Lumber, Lath, Shingles, Pickets, Posts, Timber, Hardwood Flooring, or other merchandise, not more hazardous, their own or held by them in trust or on commission, or sold but not delivered, all contained in their yard or in buildings, sheds, or cars on track, in said yard, situated on the east side of Ashland avenue, extending north from the West Branch of the South Branch of the Chicago river, Chicago, Illinois. Other insurance permitted until required. Warranted by assured that streets shall be kept clear of lumber; that piles of lumber shall not exceed thirty-five feet in height; that there shall be maintained a clear space of sixty-five feet north of main part of mill."

There was a fire on the premises of the John Spry Lumber Company on October 6, 1905, while these policies were in force, which destroyed and damaged lumber and merchandise of like character, in the planing mill and adjoining and communicating buildings of said company, in the yard "situated on the east side of Ashland avenue, extending north from the west branch of the south branch of the Chicago river."

This lumber and merchandise were covered by the terms of the policies before quoted, and the appellee, the John Spry Lumber Company, demanded from the Queen Insurance Company the sum of $1,408.96, from the National Union Fire Insurance Company the sum of $1,207.68, and from the Virginia State Insurance Company the sum of $402.57.

On the refusal of the respective companies to pay these sums, the lumber company brought suits at law against them respectively, which were pending when the bill in this case was brought.

The refusal of the companies to acknowledge and pay the loss was presumably due to the same position on their part which they take in this bill, namely, that the companies did not intend by their respective policies to cover the property which was destroyed or damaged, and which was situated "in the planing mill and adjoining and communicating buildings," but intended to cover only the lumber and other merchandise contained in the yard or in buildings, sheds or cars on track in the yard *outside* of the said planing mill and adjoining and communicating buildings, and that the lumber company knew that the insurance companies thus intended to cover only the last mentioned property, and indeed represented to the said insurance companies that it desired insurance by said policies only on said property, and represented also that the "policy form," as it is called in the bill—being the part of the policies before quoted—described only said property.

In this cause below it was stipulated between the

parties in open court that the defendants would not raise the question on the trial—although it was suggested by their answers—that there was a misjoinder of complainants, or that the bill was multifarious. No such question is, therefore, considered by us, and we pass on the case on its merits.

It is not claimed by the companies that the policies in question did not clearly cover the property for the loss and damage to which claim is made against them, but it is said that it was by their mistake so covered, and that this mistake was made under such circumstances and with such representations or statements on the part of an agent of the lumber company, that these written contracts of insurance should be reformed.

It is undoubtedly true, as urged by appellants, that mutual mistake is often a ground on which reformation of contracts can be demanded and obtained, and that the proven misrepresentations of one party to a contract, inducing the making of a contract in a particular form by the other, may be, under certain circumstances, good ground for the rescission or reformation of such a contract, and estop the misrepresenting party from insisting upon the expressions of the actually written contract.

But before passing on the claims of the complaining companies in this case, it would be well to advert to facts which are undisputed and pertain to and affect the relative position of the parties.

The policies in question were issued by the respective companies after the policy form, printed, had been given them. The agents directly responsible for their issuance were regularly doing business in Chicago. It was their business to know everything necessary to be known of such risks—the "lumber lines" being well known sources of business income to the companies. They had atlases and memoranda which they could consult, giving all that necessary information. The companies had all, by their resident agents, is-

sued like policies for previous years, which policies had expired, and of which those now in question were an extension. They had received the premiums demanded on the policies.

The agent of the lumber company—as appellants claim him to be—whose "mistake" or "misrepresentations" are to be, according to the contention of appellants, imputed to the appellee, was an insurance agent in the same way of business as themselves, representing various insurance companies as their general agent, but securing from other agents policies for his clients or customers when unable to furnish them from his own companies—being held in such case for the premiums less a brokerage commission allowed him, and in his turn holding his customers for the full premium. Waiving, therefore, a discussion of the questions whether insurance brokers in general are agents of the insured or of the insurer, and whether in this particular case Requa was in any sense the agent of the lumber company rather than of the insurance companies, it is plain that his agency for the lumber company, if it existed, was in the purest sense a special one for the purpose of securing this insurance. He had no general right at least to speak for the insured. He had been applied to for insurance by the lumber company, who did not care from whom it ultimately came, so it were good, as the responsible factor in procuring and furnishing it, and his relations to the lumber company were known in this sense, according to the natural course of business, to the agents of the now complaining companies. There was nothing, therefore, in the nature of those transactions and dealings, which resulted in the issuance of these policies, which excused or should have led to carelessness or heedlessness on the part of the contracting insurance companies or their agents—nothing so to throw them off their guard as to cause them for successive years to sign and issue printed policy forms containing clear and unambiguous descriptions of property they did not intend to insure.

These alleged mistakes and misrepresentations were not discovered, nor was a rectification attempted, while the parties might, by the return of the premiums on the one hand and a surrender of the policies on the other, have been placed *in statu quo,* but after a fire has destroyed the property insured and no such re-establishment of former condition is possible, the power of the court sitting in chancery is invoked in name to reform and in effect to rescind the contracts.

The appellants rely much on a claimed estoppel; but it seems to us that if the general principles of estoppel are invoked, they will rather foreclose than aid the appellant companies. It was during the years when the parties could have been placed *in statu quo* and when new insurance could have been obtained by the lumber company, that the "policy forms," of which the companies retained copies, should have been scrutinized, if they were hastily and unheedingly inserted in the insurance contracts. On such scrutiny, at least, if because of the rate paid or for any other reason the risks as actually taken were not those which the companies desired to carry, they could have put an end to the insurance, for they had reserved in their contract the power to cancel them at any time on five days' notice—retaining, moreover, a proportionate part of the premiums paid. With this ability—first, to refuse a printed application which was clear and unambiguous, and, secondly, to cancel the contract founded on it and embodying it whenever they pleased before a loss occurred—it seems rather late for this attempt to reform the contracts so long after their inception and, after a loss, makes of such a reformation a cancellation.

Moreover, the attempt seems to us not to be inaptly described in the words which the appellants have quoted in their reply brief from an opinion of the Circuit Court of Appeals in the Eighth Circuit in another case: "In form this is a suit in equity to reform written contracts. In fact, it is a bald attempt to super-

sede written agreements with the parol negotiations which preceded and induced them.''

Waiving altogether, as we have indicated we do, the questions concerning which we think there is something more than grave doubt, whether Requa was the agent of the appellee, and whether his conversations with the various insurance agents are to be imputed to the appellee at all, the fact remains that all that is attempted to be proved is that an agent verbally stated that a printed application and form which he offered to the inspection of skilled experts in their line of business, with no pretense of concealment or evasion, and which was incorporated in the contracts, did not say what it plainly and directly did say.

The agents had memoranda and maps; there was no building or shed in the space in which they say Requa told them the piled lumber was situated on which he wanted insurance, and they knew, or could, by the most ordinary care, have known this, and yet they signed and delivered contracts in compliance with the application which expressly included the hardwood flooring and other merchandise in the buildings standing on other space. Is it not such a case as the Supreme Court speaks of in Steinmeyer et al. v. Schroeppel, 226 Ill. 9, where it says: ''If equity would relieve on account of such a mistake, there would be no stability in contracts?'' This, at all events, is our opinion as applied to the facts of the present case.

It may well be that had the appellants' agents been properly careful in their business and properly mindful of what they were doing, they would not have issued these policies. This seems a fair inference from their testimony. But the fact remains that they did issue them and allowed them to remain in force until it was too late for the appellee to replace them, and until the contingent liability on them had become absolute. And this they did, as it seems to us, without reasonable excuse for their own carelessness in any acts or utterances of the appellee, even allowing Mr. Requa to

have been its representative in bargaining for the insurance.

The evidence to support a reformation of a written contract, especially where such reformation amounts to a rescission which will not leave the parties in *statu quo*, should approach certainty in its proof that justice requires the remedy. It does not do so in this case.

The decree of the Superior Court is affirmed.

*Affirmed.*